**Aubrey KAUFMAN, Plaintiff-Appellee,**

**v.**

**DIVERSIFIED INDUSTRIES, INC., Defendant-Appellant.**

**No. 669, Docket 71–1859.**

United States Court of Appeals, Second Circuit.

Argued May 3, 1972.

Decided May 22, 1972.

Robert M. Trien, New York City (Philip Handelman, New York City and Halpin, Keogh & St. John, New York City, of counsel), for plaintiff-appellee.

Lawrence M. Powers, New York City (Steven E. Gross, New York City, and Powers & Gross, New York City, of counsel), for defendant-appellant.

Before KAUFMAN, ANDERSON and MANSFIELD, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

In the main, this appeal presents a narrow and highly technical question of contract damages. The law of damages, however, does not lend itself to easy application or simplistic formulations, as our discussion will reveal, and an exposition of the complexities in this difficult case does not make for light reading.

In May 1968, Aubrey Kaufman and the five other shareholders of Datatron Processing, Inc. ("Datatron") sold their Datatron shares to Diversified Industries, Inc.[1] ("Diversified") in exchange

---

1. Diversified Industries, Inc. was formerly (and at the time of the agreement here in question) known as Diversified Metals Corporation.

for Diversified shares, some to be delivered immediately, some contingent on Datatron's future performance. Kaufman commenced this action in the Supreme Court, New York County (subsequently removed by Diversified to the District Court for the Southern District of New York because of diversity of citizenship), alleging that Diversified had breached its agreement to deliver conditional shares. Judge Levet determined as a matter of law that Diversified had breached the contract, and after the jury ruled in favor of Kaufman on Diversified's estoppel defense,[2] the parties stipulated to try the damage issue before the court. The total damages calculated by Judge Levet were $152,885.40—$100,759.95 for the breach itself, $34,438.65 for reasonable costs of the litigation reimbursable under an indemnity provision of the contract and the remainder for prejudgment interest. Diversified contends on appeal that the court erred in directing a verdict on liability and, in any event, erred in computing damages. We affirm the directed verdict on liability, but reverse and remand on the issue of damages.

A statement of the facts leading to the breach will aid in clarifying our resolution of the issues. Kaufman owned 17½% of the shares of Datatron when, on May 9, 1968, he and the five other Datatron shareholders contracted to sell all of the stock in Datatron to Diversified solely in exchange for Diversified shares. Pursuant to the contract of sale, Diversified initially delivered 45,800 Diversified shares to the six Datatron stockholders, of which Kaufman received 8,015. The agreement also provided that the selling shareholders would receive an additional sum of Diversified shares contingent on and varying with the performance of Datatron for the year ending December 31, 1968. The crucial provisions, which determined at what date and in what manner the number of shares due as additional compensation were to be computed, are subdivisions ii and iii of section 3(c) which follow:

(ii) If for the calendar year ended December 31, 1968, the business of the Company and its subsidiaries has Net Income After Taxes as set forth in section 3(b) (i) which is in excess of $125,000, the Stockholders shall be entitled to receive shares of Diversified Stock having a then market value equal to four times the amount of the Net Income After Taxes in excess of $125,000. For example, if Net Income After Taxes for the year ended December 31, 1968 is $200,000, the Stockholders shall receive four times $75,000, i. e. $300,000 in value of Diversified shares.

(iii) Diversified shall deliver additional shares payable hereunder within 30 days after receipt of the financial statement, together with written approval by Stockholders, from which it appears that the earnings of the Company and its subsidiaries were such as to require a payment of additional shares hereunder. The shares of Diversified Stock deliverable shall be deemed to have a then market value per share equal to the average closing price per share of Diversified Common Stock, on the Stock Exchange where it is traded for the twenty day period next preceding delivery of the shares. The market value in shares payable shall be divided by the then market value per share of Diversified Stock for determining the number of shares deliverable to the Stockholders.

An independent accountant, Lybrand, Ross Bros. & Montgomery, made the ini-

---

2. Diversified does not here challenge the jury's adverse conclusion on its estoppel claim which was based on Kaufman's alleged acquiescence in the May 5 letter purporting to fix the number of shares due under the contract. The jury was justified in finding no detrimental reliance by Diversified, even if Kaufman's actions did amount to acquiescence. Diversified discusses the estoppel defense on appeal only in an attempt to substantiate its contention that the trial court took inconsistent positions at the trials on liability and damage.

tial determination of the net income attributable to Datatron, which was subsequently approved by the former Datatron shareholders on April 29, 1969. It was stipulated in a Pre-Trial Order that the former shareholders, pursuant to section 3(c) (ii), were "entitled to receive shares of Diversified stock having a market value of $2,779,300, plaintiff's pro-rata share thereof being the amount of $486,377.50."

In its May 5 letter (signed by George Moll, President), acknowledging receipt of the approved income statement, Diversified calculated the number of shares due the former Datatron shareholders purportedly under section 3(c) (iii), by using the average market price per share for the twenty business days preceding May 5 ($36.93). The letter stated that "[i]nstructions will be entered to issue certificates in the following names and amounts: . . . Aubrey Kaufman—13,170."

The price of Diversified shares began dropping in May 1969. On June 4, thirty days after acknowledgment of the approved financial statement, the closing price as well as the twenty-day average price of Diversified was $33. As yet, no shares had been delivered to Kaufman. It was not until August 1, 1969, that Kaufman received 13,170 shares of Diversified stock, the amount determined in the May 5 letter. The twenty-day average price as of August 1 was $23.24, and the August 1 closing price was $21.-63.

Kaufman signed a receipt for the 13,170 shares on August 1 and forwarded a registered letter to Moll, which read in full:

> I hereby acknowledge receipt of 13,170 shares of Diversified Metals Corporation Stock. However, it is my understanding that the per share value was to be computed on an average

price per share twenty days preceding issuance of the shares.

> Please examine your records as I believe Diversified Metals Corporation is in error.

This lawsuit followed.[3]

### I. *Breach*

■ The threshold question is whether, as a matter of law, Diversified breached its contractual obligations. There is no dispute that physical delivery of shares did not occur until August 1. Diversified contends that the May 5 letter and other actions it took in preparation for physical delivery constituted "delivery" of shares for purposes of the agreement. Judge Levet, however, excluded evidence that Diversified took immediate steps to perform including evidence that it notified the New York Stock Exchange (with whom a listing was pending) that additional shares had been reserved for issuance to the former Datatron shareholders.

None of the excluded evidence, however, would have turned the issue of delivery into a jury question. Section 1–201 of the Uniform Commercial Code (McKinney 1964)[4], the general definitional section, defines delivery with respect to securities as "voluntary transfer of possession." More specifically, § 8–313(1) (a) provides that delivery occurs when a person acquires possession of a security. Although § 8–313(1) (d), relied upon by Diversified, broadens delivery to include possession by a third person for the account of another, that is obviously not the case here, It was conceded that on May 5 there were insufficient authorized shares to pay Kaufman and the other Datatron sellers. It would be straining the meaning of "possession" to hold that possession passed where the shares allegedly possessed are not even in existence.

---

3. Other grounds for recovery pleaded by Kaufman, including a prayer for rescission, were disposed of by the trial court. No appeal has been taken from these actions.

4. Section 21 of the agreement stipulated that New York law is to govern.

## II. Damages

### A. Date for Valuation of Shares

■ In directing a verdict on the issue of breach, Judge Levet found that the delivery of shares did not take place within thirty days of receipt of the approved financial statement. All now agree that delivery should have occurred on or before June 4, 1969.

Once the parties stipulated that the court could fix damages, the court's initial task was to fix the date to be used in valuing the shares. The number of shares to be delivered to Kaufman to fulfill the contractual requirement that their market value total $486,377.50 then could be calculated. The date opted for by Kaufman was August 1. A literal and superficial reading of the contract lends some support to this contention, since August 1 was the date of delivery. Under this theory, because the twenty-day average price as of August 1 was $23.24, Kaufman should have received 20,931 shares—7,761 more than he actually received. His damages would be the August 1 value of these shares. This interpretation, seemingly correct at first blush, cannot withstand scrutiny. If the price of Diversified shares had been rising, Diversified could have delayed delivery indefinitely, and, with each price increase, it would in theory owe Kaufman fewer shares.[5] The obvious expectation of the parties was that the price of Diversified shares would continue to increase, since the market price had risen so remarkably from the date the Diversified stock was issued to the public in 1966 until the May 9, 1968, contract date. The purpose of requiring delivery within thirty days of receipt of

the approved financial statement was to prevent Diversified from benefiting by extended delay in performance. To give any meaning to the thirty-day limit the contract must be interpreted so that it specifies not only the date for latest delivery within its terms, but also the date for computing the number of shares payable. Thus, whether or not any shares were actually delivered on June 4, the contract fixed the number of shares due Kaufman on that date. This is what Judge Levet concluded, and the parties have not disputed this finding on appeal. As the twenty-day average price on June 4 was $33, Kaufman should have received 14,739 shares.

### B. Calculation of damages

■ To calculate the monetary damages attributable to the breach, the court below first discounted the value of the Diversified shares because the shares contracted for were so-called "letter" stock. Such stock cannot be sold freely to the public and thus has limited marketability. In brief, although the shares to be delivered were to have a value of $486,377.50 as defined in the contract, the market value of the shares would actually be significantly less than the defined value. Thus, damages for total breach would be less than $486,377.50. See 25 C.J.S. Damages § 79(f): "Where . . . the contract . . . is to pay specific property, the measure of damages is the value of the property at the time of the breach, and this is true although the parties to the contract for the purpose of determining the quantity to be delivered have placed a price on it." Judge Levet decided upon a discount of 50%.[6]

---

5. Because share price was to be computed by using a twenty-day average price, such delay would be completely risk-free. If the market price were much higher on the twentieth day than on the first, Diversified could safely delay delivery. Even if the price dropped on the twenty-first day, the twenty-day average would rise because the lower first day price would be eliminated in making the computation.

Thus by employing this method, Diversified would owe fewer shares, and could keep delaying and profiting until the market price fell to its first day level.

6. At a supplemental hearing, both parties presented expert testimony to guide the court in choosing the proper figure at which to discount the value of the unregistered shares. Kaufman's three witnesses stated that a proper discount would

The court then calculated damages merely by subtracting the value received, $142,433.55 (13,170 shares at the August 1 market price of $21.63 discounted by 50%), from the value of promised performance, $243,193.50 (14,739 shares at the June 4 market price of $33 discounted by 50%), and arrived at a figure of $100,759.95. This simplistic computation obscured the nature of damages suffered for it confused the number of shares due with the value of those shares. Using the trial court's analysis, we question what the damages would have been if the price of Diversified shares fortuitously had risen to $40 by August 1. The court's figure for the value of the promised performance— $243,193.50—would remain unchanged. The value of the consummated performance, i. e., the value of the shares received on August 1, however, would be 13,170 times $40 discounted by 50%, or $263,400. Under these circumstances, the court would have been compelled to conclude that Kaufman in fact benefited from the breach, a startling result indeed when we already have determined that Kaufman should have acquired 14,739 shares but only received 13,170. Certainly these missing shares must have had some value, and Kaufman should recover their value whether the price of the shares has increased or decreased. Otherwise, the computation of damages would undercut our conclusion that Diversified should not be allowed to benefit from indefinite delay.

The basic error below was the failure to separate and analyze the two distinct elements of damage: the non-tender of 1,569 shares and the delayed tender of 13,170 shares.

There can be no doubt that damages resulted from the non-tender of sufficient shares. Here we recognize the general principle of contract law that

"[i]n determining the amount . . . . of 'damages' to be awarded, the aim in view is to put the injured party in as good a position as he would have had if performance had been rendered as promised." 5 Corbin, Contracts § 992 (1964). Damages are thus the value of 1,569 shares on the date of breach, i. e., 1,569 at $33 per share on June 4 discounted by 50%, or a total of $25,888.50.

■ Whether Kaufman suffered compensable damages as a result of the delayed tender is more problematical. Because he eventually received and accepted 13,170 shares on August 1, it is difficult to discern how the delay caused any damage, unless he would have sold the shares between June 4 and August 1. If we assume that he would not have sold the shares in the interim, then on August 1 he was in as good a position as he would have been if he had received the 13,170 shares on June 4. Reverting to Professor Corbin's formulation of the pertinent law of damages for breach of contract, we are of the view that no damages should have been awarded for delayed tender.

■ Kaufman, however, urges us to adopt a different rule in the case of a delayed performance. As stated by Williston:

> The normal measure of damages . . . is the difference in value of the goods at the date contracted for and their value when delivered.

11 Williston, Contracts § 1390 (1968). We note first that Williston specifically qualifies his formulation by stating that only consequential and foreseeable damages can be recovered. *Id.* Damages caused by a decrease in price may well be foreseeable, but are not always the consequence of delayed performance unless it can be assumed the shares would have been sold. Furthermore, Williston

---

be 20 to 33⅓% of the American Stock Exchange price. Diversified's witnesses testified the discount should be 40–60%. The court's choice of a 50% figure is

thus supported by evidence and is not clearly erroneous. Indeed, Kaufman, who would benefit from use of a smaller figure, does not contest the 50% figure.

explicitly refers to breaches by "sellers" and implicitly to sales of goods, with citations exclusively to article 2 of the Uniform Commercial Code which excludes securities from its reach. This is crucial because merchants and traders, in the normal course of business, sell or otherwise dispose of commodities. The rule affording them recovery for the drop in price is merely a shortcut for applying the traditional rule of damages as stated by Corbin. In dealing with securities, however, particularly those that are restricted, it cannot be assumed that resale would have followed in the normal course of events.

Kaufman relies heavily on Richard v. American Union Bank, 253 N.Y. 166, 170 N.E. 532 (1930), but we do not find it to be helpful to his position. The facts in *Richard* disclose that he paid $72,500 to the defendant Bank in exchange for future delivery of two million Rumanian lei (the currency of that country). The Bank did not deliver the foreign currency until well after the stipulated date, by which time the two million lei had dropped substantially in value measured by American dollars. The New York Court of Appeals, affirming an order striking affirmative defenses of defendant, held that Richard could recover damages for the delay. The opinion, however, makes clear that the crucial factor in its holding was the indication in the pleadings that Richard intended to resell the lei:

> Delayed performance of the contract may be less valuable than the performance as stipulated. Though a buyer of a commodity may accept delivery of the commodity after the stipulated date, he may still retain his right of action for damages caused by delay. . . . *At least where the commodity is purchased for resale* and has a fluctuating market value the damages suffered by delayed delivery of the commodity are measured by the difference between the market value at the stipulated time of delivery and the market value at the time of the delayed delivery. (Emphasis added.)

*Id.* at 174, 170 N.E. at 535.[7] The record in this case does not permit an inference that Kaufman would have sold the 13,170 shares had he received them on June 4. In fact, although Kaufman had the burden of proof on this issue, all the evidence points in the other direction.[8]

---

7. Moreover, the pleadings in *Richard* indicated that the Bank knew the price of lei was falling and deliberately delayed performance so that it could buy lei at the market after the price dropped, and then perform its contract with Richard with the depreciated currency. Here, of course, Diversified in no way profited from the delay. Its own stock—the "currency" envisioned in the contract—was no less costly to Diversified merely because its market value has dropped.

8. For example, Kaufman made no attempt to dispose of 8,015 Diversified shares which he already owned. Nor did he sell the 13,170 shares when he received them, although the price continued to drop.

   It might appear that we are penalizing Kaufman for having accepted the 13,170 shares, for it would seem that if he had refused them on August 1, he could have received their dollar value as of June 4, saddling Diversified with the market drop. Closer analysis, however, indicates this is not so. A court awarding damages would have valued the shares after a suitable discount for their limited marketability, just as Judge Levet did. Assuming Kaufman expected the company to continue performing well, he was in a better position with the 13,170 unregistered shares in his possession than with damages in lieu thereof. His damages on June 4 with respect to the shares would have been 13,170 times $33 discounted by 50%, or $217,305. Even at the August 1 price of $21.63, Kaufman could have purchased only 10,047 Diversified shares for $217,305—considerably fewer than were delivered by Diversified. Moreover, the value of unregistered shares would soon approach the open market price because the May 9, 1968 agreement provided that Diversified would use its best efforts to register all unsold shares of the former Datatron owners within three years. The undisputed evidence indicates Kaufman was desirous of maintaining a position in Diversified stock. This was particularly true on August 1, since August 12 had been set for a spin-off distribution of Datatron stock to shareholders of record

In light of our discussion, we conclude that Kaufman's damages should have been limited to $25,888.50 for the non-delivery of 1,569 shares.

## III. *Other Recovery*

In addition to the damages occasioned by non-delivery, Kaufman is entitled under section 6 of the agreement to indemnification for "reasonable costs, legal and other expenses" incurred as a result of Diversified's breach. Since we have reduced the damage award significantly and legal fees depended on a contingent fee agreement which Judge Levet considered in making his award, it follows that Judge Levet should reconsider damages under the indemnification clause.[9]

■ Finally, we agree that Kaufman is entitled to interest on the damage award pursuant to New York C.P.L.R. § 5001, which upon remand will be adjusted in light of the reduced recovery.

We have examined the other arguments of the parties, but find them to be without merit.

Affirmed in part, reversed in part and remanded for further proceedings in accordance with this opinion.

of Diversified. Thus, an award of damages for late delivery would simply present Kaufman with a windfall.

This is in sharp contrast to the cases Kaufman cites in which market drops were laid at the defendant's door even without demonstration that the plaintiff would have sold his shares in the interim. In In re New York, N.H. & H.R. Co., 64 F.Supp. 487 (D.Conn.1945), those holding stock as collateral were wrongfully enjoined from selling the shares. By the time the injunction was lifted, the stock had become worthless. The noteholders then sought treatment as secured creditors to the extent of the value of shares when the injunction was ordered. The court properly rejected the argument that the noteholders must show they would have sold the shares but for the injunction. After all, the wrongful act—obtaining the injunction—precluded the noteholders from taking the very steps defendants insisted they must prove. Crucial to the recovery in *New York,*

*N.H. & H.R. Co.,* then, was that the complaining party had unfettered control of stock, but his *jus disponendi* was destroyed by the wrongful act of another. This is also true of the stock conversion cases cited by Kaufman. *See e. g.,* Gelb v. Zimet, 34 Misc.2d 401, 228 N.Y.S.2d 111 (N.Y.Sup.Ct.1962); German v. Snedeker, 257 App.Div. 596, 13 N.Y.S.2d 237, rearg. denied 258 App.Div. 708, 14 N.Y.S.2d 1012, affd. 281 N.Y. 832, 24 N.E.2d 492 (1939); cases cited in 31 A.L.R.2d 1323–1329 (1970).

9. The district judge should be mindful that allowable costs have increased because of this appeal and the further proceedings that will be required. Since costs on appeal would be recoverable under the indemnity clause of the contract, it would be a waste of time to take the circuitous route of awarding costs on appeal against Kaufman only to permit him to be indemnified for these costs by Diversified. Accordingly, we direct that the costs on appeal be taxed against Diversified.