### MADISON FUND, INC., Plaintiff,

v.

### The CHARTER COMPANY, Defendant.

### No. 73 Civ. 2633 (WCC).

United States District Court,
S. D. New York.

Jan. 14, 1977.
Supplemental Opinion March 3, 1977.

Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for plaintiff; Tyson W. Coughlin, Matthew M. Strickler, Philadelphia, Pa., of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for defendant; George Weisz, Victor I. Lewkow, New York City, of counsel.

## OPINION

CONNER, District Judge.

On June 12, 1969, plaintiff Madison Fund, Inc., (Madison) and defendant The Charter Company (Charter) consummated a private-placement agreement for the purchase/sale of· unregistered Charter common stock. By unhappy irony, the fourth anniversary of that event was immediately followed by Madison's institution of this action for breach of contract and common-law fraud.[1]

---

1. As originally filed, Madison's complaint had joined Shearson, Hammill & Co. as a party defendant. By Memorandum and Order dated September 24, 1975, this Court dismissed those counts of the complaint that had charged both defendants with violations of the Sherman Act and the Securities Exchange Act of 1934. On plaintiff's motion, a remaining claim against Shearson was dismissed for purposes of diversity jurisdiction.

The history of the parties' contractual relations, their corporate honeymoon in Nassau, the Bahamas, and the proverbially swift disillusionment that followed, was the subject of a five-day trial without a jury. This Opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a) F.R.Civ.P.

I

A publicly-held, closed-end investment company, Madison is a Delaware corporation with a principal place of business in New York, New York. Charter, organized under the laws of Florida, has its principal place of business in Jacksonville, Florida. In the spring of 1969, Madison was introduced to Charter through the offices of one Henry Barnard, then a New York investment banker and a friend of Raymond Mason, Charter's President [Barnard Deposition (Dep.) at 8, 13]. Prompted by Barnard's apparently forceful advocacy, Bancroft Davis, then a Vice President of Madison, "strongly recommend[ed]" to Edward Merkle, Madison's President, that Madison purchase, through a private placement, the entirety of a projected $4,500,000 issue of unregistered Charter common stock [Defendant's Exhibit (DX–) A]. Davis, however, failed to inspire equal enthusiasm in Merkle [Merkle Dep. at 18]. Nevertheless, Merkle ultimately agreed to Madison's purchase of 64,500 shares of unregistered Charter common stock, for a total consideration of $3,000,000.

The June 12, 1969 letter agreement that reflected the parties' transaction (the Agreement) was initially drafted by Charter's Jacksonville-based general counsel, Smith, Hulsey, Schwalbe, Spraker & Nichols (Smith, Hulsey). Forwarded for review to Madison's general counsel, the Philadelphia firm of Ballard, Spahr, Andrews & Ingersoll (Ballard, Spahr), the Agreement was there revised to include an allowance to Madison of a primary right of registration. Ballard, Spahr, for its part, was entirely satisfied with the Agreement in its final form [Transcript (Tr.) at 385].

The June 12, 1969 closing was conducted in the casual setting of a Nassau hotel room—an atmosphere that hardly presaged the tensions that would follow [Tr. at 603–04]. Among those in attendance at the closing was a representative of MAD International Fund, which was, at the same time but via a separate form of agreement, purchasing 21,500 unregistered Charter shares. That transaction, as well as a purchase by F.O.F. Proprietary Fund, Ltd., (FOF) of 32,250 unregistered Charter shares, [DX–B], was referenced in Paragraph (1), Section 4, of the Agreement, in connection with the provision respecting Madison's primary right of registration.

The Agreement's reference to FOF was by implication only; and no FOF representative was present at the June 12, 1969 closing. FOF was nonetheless to figure prominently at the surface of the present case. But it is Paragraph (2), Section 4, of the Agreement that lies at this action's root. That provision reads, in pertinent part, as follows:

"Charter agrees that if at any time Charter shall determine to make application to register any of its securities under the [Securities Act of 1933], it will upon each such determination promptly give written notice of its intention in that regard to [Madison]. Upon a written request from [Madison], given not more than twenty days after receipt of notice from Charter of such proposed application, Charter will at the time of making such application also endeavor to register under the Act any shares then held by [Madison] * *."

The provision following Paragraph (2) of Section 4 is quoted in full below:

"Charter agrees to use its best efforts to the end that each registration of Shares required to be made by Charter pursuant to paragraphs (1) and (2) hereof shall become effective as promptly as practicable and shall remain effective for a period of not less than nine months. Each registration hereunder shall be at the expense of Charter; provided, however, that Charter shall not be obligated to

bear the expense of any underwriting charges, commissions or fees with respect to the Shares."

## II

On the day of the Madison-Charter closing, the National Association of Securities Dealers reported "bid" and "asked" prices for Charter stock in the over-the-counter (OTC) market of $56.50 and $58.50 respectively [Plaintiff's Exhibit (PX-) 141]. Subsequent reports by the National Quotation Bureau served as the unhappy chronicle of a steady and steep decline in the OTC market price of Charter stock from the latter part of 1969 through the end of 1970. Thus, for example, during the fourth quarter of 1969, the highest "bid" price reported was $38.50; during the fourth quarter of 1970, by contrast, the highest "bid" price reported was $17.625 [PX-138, at 16].

While the market price of Charter stock woefully sagged, Merkle, for one, sustained a notably level estimate of Charter: from the outset, and notwithstanding optimistic reports in memoranda from Davis [PX-94, 95], Merkle was dissatisfied with Madison's investment in Charter and distrustful of Charter's management and associates [Merkle Dep. at 52, 62, 152, 207; Tr. at 395]. Indeed, by the beginning of 1970, comments from a disgruntled Merkle had spurred his Madison subordinates to some tentative consideration of a suit against Charter, among others, on the ground of fraud in connection with the June 12, 1969 transaction [PX-96; Tr. at 394; Merkle Dep. at 56–57]. Moreover, Davis—who had apparently been Charter's staunchest ally in the Madison ranks—was removed from his post at Madison in September 1970.

## III

On February 3, 1971, FOF, exercising its primary right of registration as provided by contract dated June 23, 1969 [DX-B ¶ 9(d)], notified Charter that it wished its 32,250 [2] Charter shares to "be registered with the United States Securities and Exchange Commission as promptly as possible." [DX-C]. On or about February 17, 1971, Robert DeVeer—then a Madison Vice President responsible for oversight of Madison's Charter investment, [Tr. at 339]—was informally advised by Mason and Lloyd Smith, the latter a senior partner of Smith, Hulsey, that a registration of FOF's Charter shares was contemplated and that Charter "would be pleased" to allow Madison a "piggyback" registration in accordance with the provisions of Paragraph (2), Section 4, of the Agreement [PX-99, 101].

Confirmation of that advice came to Madison by letter of March 26, 1971 [PX-4], which added the cautionary observation that, "You should request registration only if you presently intend to dispose of the registered securities during a proximate period following the effective date of the registration statement." [PX-4, at 2]. Madison responded on April 8, 1971, requesting that Charter include Madison's 64,500 Charter shares in the proposed registration [PX-8].

Of the forty Charter securityholders similarly polled, i.e., other than Madison and FOF, [PX-5], twenty-nine indicated that they wished to exercise their "piggyback" rights. The proposed secondary offering—an aggregate of 455,482 shares of common stock, 328,572 shares of convertible preferred stock, and warrants to purchase 158,-635 shares of common stock—was accordingly reflected in a June 20, 1971 registration statement proof, prepared by Charter, for a "shelf" registration, i.e., for public sale on a "from-time-to-time" basis. [DX-D].

## IV

During the spring of 1971, the possibility of a primary offering in conjunction with the planned secondary had been tentatively explored by Charter through consultation with the New York investment banking firm of Shearson, Hammill & Co. (Shearson) [Tr. at 29–30]. Hence the May 25, 1971 letter of intent sent to Charter by Shearson,

---

**2.** The FOF notice's reference to "32,500" shares was apparently erroneous.

in which the latter proposed to lead a firm-commitment underwriting of simultaneous primary and secondary distributions, on the condition that the prospective selling securityholders agree "not to sell or to have offered for sale any of the Company's securities, including its Common Stock, for a period of 120 days following the contemplated public offering without prior written consent of Shearson." [PX–10].

Charter's plan for a primary distribution, although itself fleeting, had effectively imported the notion of an underwriting into Charter's considerations. Indeed, by letter dated June 10, 1971, Edward Mishkin, a partner at Cleary, Gottlieb, Steen & Hamilton (Cleary, Gottlieb), special counsel to Charter, had suggested to Smith, Hulsey that the latter "might wish to raise with Ray Mason the question of a firm underwriting for the secondary distribution even in the absence of a primary offering at this time by the Company." It was Mishkin's independent assessment that "it would not only be in the interest of the Selling Securityholders but, probably, in the interest of the Company as well if a firm underwriting could be arranged to cover the secondary distribution or at least a substantial part of it." That estimate had been reinforced by Mishkin's discussion with counsel for Cerberus Associates, one of the selling securityholders; the latter, according to Mishkin's account, had recommended proceeding through an underwriting, commending its advantages in view of the potential practical and legal problems of distributing the large number of shares projected to be registered. [DX–F].

As noted above, Charter nevertheless proceeded with its preparation of the June 20, 1971 shelf-registration statement proof, copies of which were mailed to the selling securityholders, for their review, on June 22, 1971. By cover letter of that date, the selling securityholders were advised, *inter alia*, that "Shearson, Hammill & Co. has indicated to [Charter] that they might be interested in * * * an underwriting," and were asked to contact Charter if they wished to participate in such an underwrit-

ing [PX–11]. Madison, through its Delaware-based Secretary-Treasurer, John Barry, replied by letter of July 6, 1971, notifying Charter that it "did not wish to join in any underwriting of its Charter shares." [PX–13, 15, 16].

By letters dated July 8, 1971, the selling securityholders were formally canvassed for their interest in a firm-commitment underwriting, Charter urging that the Shearson proposal be given "serious consideration." [PX–21]. FOF and Madison, among others, advised Shearson, via form responses supplied by Charter, that they were interested in disposing of their entire holdings in Charter shares through the suggested underwriting [DX–I; PX–23].

The latter response by Madison, on July 13, 1971, and again through the office of John Barry, might well have appeared curious in light of Madison's former communication. However, between July 6 and July 13, 1971, the market price of Charter stock had risen more than six points, from $38 per share to approximately $44 per share. [PX–82]. And, on July 13, 1971, George Kelner—Madison's in-house counsel, acting on authority from Merkle or DeVeer [Tr. at 147; Merkle Dep. at 111]—called Shearson to advise that Madison's disposition toward an underwriting was qualified by a $42 "upset" price [PX–24; Tr. at 111–12, 238–39]. Pressed further by Alan Cleland, an associate at Shearson, Kelner allowed that the figure thus cited was not "carved in stone," *i.e.*, that Madison might conceivably join in the underwriting at a lower price [PX–24; Tr. at 156, 238–39].

The substance of his conversation with Kelner was recounted by Cleland to Smith, Hulsey, in a letter dated August 9, 1971 [PX–25]. In that same letter, Cleland observed that both he and his superior at Shearson, Sidney Bogardus,

"were extremely pleased to learn, last week, that the warrant holders presently listed in our [registration statement proof] will not exercise their piggyback rights for a shelf registration coincident with our proposed offering. In return we understand that Charter has offered

these securityholders a demand registration right after audited 1971 figures become available. We believe this was an extremely sound business decision on the Company's part * * *."

Indeed, by the first week of September 1971, the number of selling securityholders had been reduced from thirty-one to twelve [PX–27], all of which had indicated an interest in joining the proposed underwriting [PX–25].

V

In what was perhaps a burst of over-optimism, Charter had originally predicted a July 1971 filing of the planned registration statement [PX–11]. When the registration statement remained yet to be filed at the end of September 1971, Mark Hulsey—a partner at Smith, Hulsey—voiced Charter's sense of frustration in the face of the months-long delay, during the course of telephone conversations with Shearson's Bogardus [Tr. at 34, 40]. The principal impediment to a speedy filing, Hulsey and Bogardus apparently agreed, was the selling securityholders' equivocation with respect to the proposed underwriting. As Hulsey would later recall, all of Shearson's efforts "to get the selling securityholders to stand still or let us * * * decide what they were going to do with respect to the registration statement" had theretofore been confounded [Tr. at 35].

The securityholders' indecision had undoubtedly been, at least in part, the result of a gradual decline in the market price of Charter stock since the previous July [PX–82]. Nevertheless, Bogardus assured Hulsey that Shearson would once again contact the selling securityholders, to probe their intentions [PX–119].

On September 30, 1971, Leonard Larrabee of Dewey, Ballantine, Bushby, Palmer & Wood, counsel to Shearson, forwarded to the selling securityholders page-proof copies of a proposed purchase contract between the securityholders and an underwriting syndicate [PX–31, 32]. On October 6, 1971, after consultation with Merkle [Tr. at 369–70; Merkle Dep. at 125–26], Duncan McKee

of Ballard, Spahr advised Smith, in writing, that, although Madison wished to be included in the impending registration statement, it did not intend to join in the underwritten offering [PX–33].

McKee's letter was no more than confirmation of what had already been communicated to Cleland in a telephone conversation with Kelner on the preceding day. Cleland had received that news unhappily. A simultaneous shelf and underwritten distribution, Cleland offered, would disserve the interests of all; the existence of a shelf—representing saleable stock "overhanging" the market—would be particularly unfortunate, Cleland added, were Charter to proceed with a primary offering then under consideration for the following spring. Cleland suggested to Kelner that Madison might do better to accept an additional primary right of registration in lieu of a piggyback shelf registration. However, if it were insistent upon placing its shares on the shelf, Madison might, Cleland urged, agree not to sell those shares for a period of months. Agreeing to convey Cleland's proposals and observations to his superiors at Madison, Kelner warned that, in the absence of future contrary word, it could be assumed that Madison's position had remained unchanged [Tr. at 113–15].

When Madison's notice reached Charter, the latter had, in turn, reached the long-sought point of filing a registration statement with the Securities and Exchange Commission (the SEC) [Tr. at 539–40, 695]. Eager to avoid further delay in triggering the SEC review process, and notwithstanding Madison's notice, Charter filed the initial SEC Form S–1 registration statement on the most recently targeted date, i.e., October 8, 1971 [Tr. at 539–40]. However, because that registration statement had been framed in terms of an underwritten offering only, prudence dictated removal of Madison from the S–1 list of selling securityholders [Tr. at 541, 695; PX–35]. That deletion could readily be restored, Charter reasoned, if Madison thereafter agreed to the inclusion of its Charter stock in the underwritten distribution [Tr. at 48, 541].

## VI

Charter's initial campaign to resolve the Madison problem was long-distance and short-lived. That campaign began on October 14, 1971, with a telephone call from Smith to McKee. Charter was disappointed, Smith reported, with Madison's stance, as reflected in McKee's letter of the week past. Smith "talked to [McKee] about trying to get Mr. Merkle to either come in the [underwritten] registration or back off, one of the two" [Tr. at 629], and informed McKee that Mishkin, better versed in securities matters than Smith [Tr. at 622], would contact him shortly [Tr. at 373].

Mishkin did thereafter call McKee, on October 21, 1971. Repeating the suggestions earlier proffered by Smith, Mishkin indicated that Madison might receive "some additional consideration" for its cooperation. However, Mishkin added, were Madison determined to proceed with a shelf registration, it was requested "to defer [its] sales activities until the underwriting had been completed for some period of time * * * 90 to 120 days * * *." [Tr. at 376, 754].

In an effort to reinforce his suggestions, Mishkin stressed the practical problems that had been left in the wake of Madison's fitful lurching toward the shelf. As Mishkin later recalled,

"I told [McKee] that we had been working for some time on the registration statement, * * * that in an initial circularization of * * * various piggyback holders a large number of them had indicated an interest in participating in the registration statement, * * * something around 900,000 shares that would have been included in a shelf, that as a consequence * * * it appeared to the selling securityholders, as well as to myself and company, that it would be desirable to provide an underwriting * * * to accommodate such a large number of shares, * * * that several securityholders, I think some warrantholders and some others * * * [who] did not wish to sell in an underwriting * * * were persuaded to withdraw their request to piggyback, but that if there were to be a shelf registration we would have to recirculate those particular securityholders; they might then take the position that if there is going to be a shelf they want [ ] to participate in the shelf and we could wind up back where we were with a 900,000-share offering at the shelf and no one would be effectively able to sell the shares because of the huge overhang on the market." [Tr. at 751–53, 412–13].

At Mishkin's urging, McKee agreed to convey the substance of Charter's message to Merkle [Tr. at 376, 759]. But, at least from Charter's point of view, the conversation between Mishkin and McKee ultimately proved to have generated more heat [Tr. at 374–75] than light: an October 27, 1971 letter from McKee informed Mishkin, in essence, that Madison—i. e., Merkle—would not yield [PX–39].

## VII

At some point in October 1971, Smith had been advised by McKee that the latter "couldn't do anything with [Merkle], and the only thing he could suggest * * * was to get the [Madison and Charter] principals together * * * to see what could be worked out between them * * *." [Tr. at 630]. Reports from Barnard—chosen by Smith to act as liaison between the companies [Tr. at 634]—indicated, however, that Merkle was literally and figuratively beyond the reach of Charter's spokesmen [Tr. at 561–62, 633–34]. An October 28, 1971 luncheon meeting, in New York, attended by Charter director Russell Newton, Barnard, DeVeer, and Madison consultant Everett Callender—at which Charter proposed that Madison retract its pending registration request in return for a primary right of registration, [Newton Dep. at 25–28]—buoyed Charter's hope that the parties might reach an accord [Newton Dep. at 34; Tr. at 66–67]. That hope, however, was soon to be dimmed by the news that Merkle, and with him Madison, "weren't interested." [Merkle Dep. at 142].

## VIII

Kenneth Kirschner, then an associate at Cleary, Gottlieb, had been assigned to assist in preparation of the Charter secondary offering from the project's inception. [Tr. at 690]. Honoring the tradition that the junior associates, though the last to learn of, are the first to fall victim to, eleventh-hour changes in plan, Mishkin directed Kirschner—on or about November 2, 1971—to prepare for the Charter-stock offering a single prospectus with two wrap-around registration statements, one for an underwritten offering, the other for a shelf [Tr. at 698, 761].

Kirschner's efforts during the following days resulted in (1) a proof of an amendment to the S–1 statement filed on October 8, 1971, referring to a simultaneous shelf registration, and (2) another proof of a shelf registration including Madison's Charter stock [PX–43, 44]. Such was the manner in which Madison's wish was to be accommodated. But Charter apparently retained some hope that the Madison "problem," [PX–120], might yet be otherwise resolved [Tr. at 793].

During the month of October 1971, the decline in market price of Charter stock had not abated [PX–82]. Still aware that, under such market conditions, willingness to participate in an underwritten offering might prove ephemeral, Charter decided to survey the selling securityholders' positions once again [Tr. at 445–46; PX–41]. Thus, on November 3, 1971, a conference was held in the Cleary, Gottlieb offices, its participants including representatives of Charter, Shearson, and eight of the selling securityholders [PX–42]. The latter were asked (1) whether they would join in the underwritten offering at current market price levels; (2) if not, whether they would agree to forgo a shelf registration or, in the alternative, defer sales of stock on the shelf for 120 days after completion of the underwriting [PX–42; Tr. at 73–74].

The responses to those questions apparently were mixed [Tr. at 81, 460; PX–42]. FOF, among others, indicated that it remained interested in the planned under-

writing [Tr. at 794; PX–42]. Shearson, for its part, asserted its willingness to proceed with the underwriting provided that, if there were indeed to be a shelf, the latter would hold no more than 100,000 shares [PX–42; Tr. at 471–72]. Thus, Charter gathered from the meeting merely "an idea" of where the selling securityholders then stood on the underwriting/shelf question [Tr. at 71, 80].

## IX

The copy for the underwriting/shelf registration statements had arrived at the printer in Jacksonville by November 11, 1971 [Tr. at 704]. On that day, Hulsey discussed the planned registrations with Robert Shapiro, the SEC staff attorney most directly involved in the agency's review of the registration statement that had been filed by Charter on October 8, 1971. [Shapiro Dep. at 9]. Shapiro advised Hulsey, *inter alia*, that, under SEC Rule 10b–7, the underwriter would not be allowed to enter a stabilizing bid during the course of the underwritten distribution if Madison planned to sell its Charter stock at the same time. [Shapiro Dep. at 12, 24; PX–46]. Shortly thereafter, Charter asked Shearson, through Larrabee, if it would agree not to stabilize the market during the underwriting. After some deliberation, Shearson responded that it would not proceed without the right to stabilize [Tr. at 477].

Hulsey and Shapiro spoke again on November 16, 1971; by that time, proofs of the underwriting/shelf registration statements had been forwarded to Shapiro for his informal examination. As a result of his recent conversations with Hulsey, and assuming that Shearson would refuse to depart from normal underwriting practice with respect to stabilization [Shapiro Dep. at 12], Shapiro expected that the concurrent shelf registration—to conform to the SEC's position—"would not be declared effective, or the offering would not be made, at the same time as the underwritten offering." [Shapiro Dep. at 30].

Hulsey's own understanding of the SEC's position, however, appears to have been sig-

nificantly different. Thus, reporting Shapiro's comments of November 13, 1971 to Mishkin and Smith [Tr. at 450, 637–38, 762, 797], Hulsey advised that—in view of Shearson's insistence upon its right to stabilize—the underwriting/shelf registrations could go forward only if Madison agreed not to dispose of its shares from the shelf until at least 90 to 120 days after completion of the underwritten distribution.

The 90-to-120-day period thus cited by Hulsey appears to have been born of some confusion on Hulsey's part, perhaps arising out of the conference with the selling securityholders on November 3, and perhaps in some measure derived from wishful thinking. Shapiro himself could not later recall any mention of such a period during his communications with Hulsey [Shapiro Dep. at 12–13, 25]; nor would Rule 10b–7, at least in terms, have inspired such a reference [DX–O]. Moreover, Hulsey's notes—taken during the November 13, 1971 conversation—do not reflect any reference by Shapiro to a 90-to-120-day period. [PX–46]. And, as Hulsey himself thereafter allowed, albeit in another context, "[I]f Shapiro said to me that the prospectus had to have a red giraffe with a yellow ear on it * * *, I would have put it down." [Tr. at 93]. Thus, whatever the source of the 90-to-120-day proviso, it does not appear to have been Shapiro. The SEC's stance simply did not coincide with the position earlier assumed by Charter and Shearson.

## X

In view of the foregoing events, including those reported to him, Lloyd Smith decided that—unless an accommodation could be reached with Madison within the following days—the shelf registration could not proceed concurrently with the underwritten registration. Accordingly, on November 17, 1971, Smith proposed to the Charter Board of Directors that the underwritten offering proceed as scheduled, with the shelf registration statement to be filed shortly thereafter. That proposal was approved by the Board [Tr. at 642–45; PX–43]. Within a few days, through the combined efforts of counsel for Charter and Shearson, references to a simultaneous shelf registration had been eliminated from the underwritten registration statement [PX–54, 58].

During the succeeding days, still hoping that an accord could be reached with Madison, Smith maintained contact with Barnard, who had been asked to relate to Madison the problems that had ostensibly been raised by Shapiro [Tr. at 650]. Barnard appears to have reported to Smith that he had had some communication with DeVeer [Tr. at 651]. Whether or not that report was accurate, Barnard was in any event unable to report that he had accomplished any change in Madison's position.

The underwritten registration statement, from which Madison's Charter stock had earlier been eliminated, became effective, upon Charter's oral request to the SEC, at 10:30 A.M. on December 2, 1971 [PX–64, 65]; the accompanying prospectus recited that "approximately 67,000 shares of Common stock * * * are expected to be offered from time to time in the near future by certain securityholders pursuant to another prospectus." [PX–66]. The underwritten distribution—of 311,122 shares of Charter common stock—was completed by 10:00 A.M. on December 3, 1971. The highest "bid" price of Charter stock on that date was $29.50. There is no evidence that a stabilizing bid was ever entered on December 2, 1971, much less continued thereafter [Tr. at 277; PX–139].

On December 16, 1971, Charter filed with the SEC a shelf registration statement including Madison's Charter stock [PX–77, 78]; Charter at that time expected that the registration statement would, in due course, become effective by early January 1972 [Tr. at 806]. However, for reasons undisputedly beyond Charter's control, the shelf registration was not declared effective until August 31, 1972. On that date, the highest "bid" price of Charter stock—which had reached a peak of $45.25 on January 28, 1972—had declined to $29.375 [PX–82]. The market price of Charter stock continued to decline thereafter. Between August 31, 1972, and May 8, 1973, *i. e.*, the period during which

Madison disposed of its entire Charter stock holdings, Madison realized an average price per share of slightly less than $23.

## XI

In a diversity case, a federal court is obliged to follow the choice-of-law rules that prevail in the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). With so much acknowledged, both parties to the present action agree—as does this Court—that Florida law supplies the measure of the claims raised herein. That accord is grounded upon a choice-of-law provision included in the June 12, 1969 contract, *i. e.*, that the Agreement "shall be construed and enforced in accordance with and governed by the laws of the State of Florida." [PX–1]. Such a provision will ordinarily be honored by a New York court, so long as the state thus selected has some meaningful contact with the subject transaction and the application of its law will not offend any fundamental policy of another state having a materially greater interest in determination of the particular issues at bar. See, *e. g., Wyatt v. Fulrath*, 16 N.Y.2d 169, 264 N.Y.S.2d 233, 211 N.E.2d 637 (1965); *A. S. Rampell, Inc. v. Hyster Company*, 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957). Under such a standard, the present case offers no basis for a departure from the parties' choice of law.

▪ Charter has launched its defense against Madison's breach of contract claim by invoking the terms of the Agreement itself. Thus, Charter argues, its obligation with respect to a "piggyback" registration of Madison's Charter shares was hardly absolute: Charter promised no more, after all, than to "endeavor" to register such shares. Charter argues, with some vigor, that the term "endeavor" is wholly unambiguous and must therefore be read in accordance with its "normal [dictionary] meaning," *i. e.*, to "attempt" or to "try" to accomplish a result, citing Florida authorities in support of the general proposition. See, *e. g., Shaw v. Bankers Life Co.*, 213 So.2d 514 (Fla.App. Ct.1968); *Johnson v. Three Bays Properties*

*No. 2, Inc.*, 159 So.2d 924 (Fla.App.Ct.1964). And, Charter asserts, having exerted no small effort to accommodate Madison's registration request, Charter may scarcely be faulted with a failure to have "attempted" or "tried" to register Madison's shares.

Basic principles of contract construction set the gauge of Charter's argument. Thus, under the law of Florida, as elsewhere, a Court's first task in the interpretation of a contract is to determine the intent of the parties thereto. *Jacksonville Terminal Company v. Railway Express Agency, Incorporated*, 296 F.2d 256, 259 (5th Cir. 1962). Where that intention is clearly manifested on the face of the contract itself, "the judicial task is at an end", *id.*, that is, resort to extrinsic evidence would be unnecessary and, indeed, improper. Furthermore, a court is obliged, "absent extraordinary circumstances, * * * to interpret a contract in accordance with the natural and ordinary meaning of the language employed therein," *id.* at 261; often enough, however, the practical reading of a contract term, phrase, or clause will be informed by the context in which it appears.

Having established so much, this Court cannot conclude that Charter's obligation under Paragraph (2), Section 4 of the Agreement was as open-ended as defendant apparently would have it be. A commonsense reading of the contract at bar simply does not accord with Charter's thesis that the nature and extent of its "endeavor" to register might, in effect, be self-determined. As noted above, Paragraph (2), Section 4 provides that, upon "determin[ing] *to make application* to register any of its securities," Charter would, if requested to do so by Madison, "*also endeavor to register*" Madison's stock. [Emphasis added]. Moreover, the following paragraph provides that Charter would "use its best efforts to the end that *each registration * * * required* to be made *pursuant to paragraph[]* * * * *(2)*" would "become effective as promptly as practicable." [Emphasis added]. The above language leaves no doubt that the parties herein subscribed to one of those " '[b]est efforts' registration clauses

are common and are significant" to the extent that they recognize that, "[d]ue to the nature of the securities business and the vagaries of the SEC, registration can never be *guaranteed* * * *." *Lipsky v. Commonwealth United Corporation*, 551 F.2d 887, at 896 (2d Cir. 1976) (emphasis in original).

What remains for consideration on the question of contractual liability is whether Charter's "endeavor" to register Madison's shares on December 2, 1971, was frustrated by circumstances beyond Charter's best-efforts control. See *Republic Technology Fund, Inc. v. Lionel Corporation*, 483 F.2d 540, 552–53 (2d Cir. 1973), *reversing* 345 F.Supp. 656 (S.D.N.Y. 1972). In this respect, there is no need to join the parties in their respective musings on the Charter-FOF contract, *i. e.*, whether Charter was contractually bound to provide FOF with an underwriting or, indeed and in any event, whether FOF—the primary registrant—would not have proceeded toward registration without an underwriting. Nor need this Court share in the parties' speculation on the consequences that would have ensued had an underwriting been sacrificed to Madison's request for a shelf.

Under the facts retraced above, this Court concludes that the underwritten registration, with Shearson's right of stabilization reserved, did not foreclose a concurrent shelf registration; there was, in truth, no need for a sacrifice of the one to the other—or *vice versa*. This Court thus further concludes that Charter breached its obligation to Madison when—through apparent confusion of signals on Hulsey's part—it failed to follow Shapiro's suggestion that "the registration statement be used for both [an underwriting] and the shelf, but the shelf should be delayed until such time as the underwritten offering had been completed or no stabilization was to continue." [Shapiro Dep. at 12]. Had that suggestion been followed, through a delaying amendment for the shelf, the shelf registration including Madison's stock could have become effective—upon an acceleration request by Charter to the SEC—as early as December 3, 1971.

It is true, of course, that Madison had never agreed to even so much—or so little—as a one-day delay in the effective registration of its Charter shares. In view of Madison's position with respect to the underwriting, however, it might fairly be assumed that Madison would have so agreed, had it been asked. But, more to the present point, Madison's action is not grounded on such a delay and we must take the case at bar as we find it.

In light of the above, it could scarcely be clearer that, whatever the intransigence on Madison's part during the months preceding December 1971, that "failure to cooperate" cannot avail Charter here. This Court is not unmindful of the principle that, " 'Where a party contracts for another to do a certain thing, he thereby impliedly promises that he will himself do nothing which will hinder or obstruct that other in doing the agreed thing.' " *Moylan v. Estes,* 102 So.2d 855, 857 (Fla.App.1958), *quoting* 7 Fla. Jur.Contracts § 145, at 213. But that principle supplies no relevant instruction for the present case. Intractable though it may have been, Madison nevertheless did nothing but refuse to compromise its rights under the Agreement. However much his animus or exploitive instincts may be revealed in the process, an obligee has the right to withstand his obligor's overtures toward adjustment of the performance owed; the former's insistence upon the performance due him may hardly be said to discharge the latter's obligation in any respect or degree. Moreover, Charter has not suggested—nor does this Court independently divine—in what way, under the facts as found above, Madison's cooperation was " 'necessary for the performance of the promise' " made by Charter. *Lowell v. Twin Disc, Inc.,* 527 F.2d 767, 770 (2d Cir. 1975).

The above conclusions make it unnecessary to consider at any substantial length Madison's charge of common-law fraud, a claim based upon Charter's purported failure to advise Madison that the December 2,

1971 registration would not include the latter's shares. It is perhaps enough to note that the facts recited above would not support a finding of scienter on Charter's part. In the absence of scienter, much less in the face of Merkle's admission that "they told us we weren't going to be in [the registration]," [Merkle Dep. at 156], Madison's fraud claim could not survive.

XII

■ It is a familiar enough principle that the basis for an award of damages for breach of contract is just compensation for losses necessarily flowing from that breach. 5 Williston, Contracts § 1338 (rev. ed. 1968). As a corollary of that principle, one whose contract has been breached is not entitled to be placed, because of that breach, in a position better than that which he would have occupied had the contract been performed.

■ By the very nature of the present case, there can be no certainty that Madison would have sold its Charter shares between December 3, 1971, and August 31, 1972, if it had been free to do so; accordingly, there can be no certainty that Madison was damaged at all by Charter's failure of due performance. See *Kaufman v. Diversified Industries, Inc.*, 460 F.2d 1331, 1336 (2d Cir. 1972). This is not to say, however, that the record fails to support an inference that Madison desired to sell during that period. Madison's consistent dissatisfaction with its Charter holdings, its insistence upon registration, and its sales subsequent to the effective date of the shelf tend to indicate that Madison would have wished to dispose of its position in Charter stock. More important, this Court concludes, fundamental justice requires that, as between Charter and Madison, the perils of such uncertainty should be "laid at the defendant's door." *Id.* at 1338 n. 8. Were it otherwise, Madison would be required to prove a disposition to take the "very steps" that defendant's "wrongful act * * * precluded [it] from taking * * *." *Id.*

The assumption that Madison would have sold its shares during the above-cited period does not bring us closer, however, to a calculation of Madison's damages. Inevitably, the question remains as to when Madison would have sold and, hence, at what price. Madison itself suggests that the record before the Court discloses the answer to that question: Madison would have retained its Charter stock until the latter's market price reached approximately $40 per share in the latter part of January 1972. The Court cannot share Madison's assurance on this point. Madison's October '71 quotation of a $42 "upset" price with respect to an underwriting was surely not immutable; if it had been, Madison would still be holding Charter stock. We now know that Madison, in the steadily declining market of late 1972 and early 1973, abandoned that price objective and unloaded its shares at prices averaging little more than half as much. So much also for Merkle's reliance on his avowed stock-sales philosophy, *i. e.*, "You wait until you get strength and you sell it." [Merkle Dep. at 166]. This Court simply cannot credit plaintiff with market prescience. And, as the Supreme Court has observed, "even where the defendant by his own wrong has prevented a more precise computation, the [factfinder] may not render a verdict [with respect to damages] based on speculation or guess-work." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946).

Defendant suggests, on the other hand, that our decision should be guided by cases involving delayed deliveries of goods having a fluctuating value. In such cases, Williston tells us, "The normal measure of damages * * * is the difference in value of the goods at the date contracted for and their value when delivered." 11 Williston, Contracts § 1390 (1968). Whether such standard would satisfy the full measure of justifiable damages in our own case, however, is problematical. First, the formula is addressed to goods other than securities, *i. e.*, whose values normally reflect general upward or downward trends, without the type of short-term vacillation to which securities are heir. Moreover, the cases cited

by defendant in this connection similarly did not involve situations as complicated as the present one.

Thus, in *Richard v. American Union Bank,* 253 N.Y. 166, 170 N.E. 532 (1930), damages for delayed delivery of Roumanian lei, purchased for resale, were declared chargeable to the defendant under essentially the same formula as that outlined by Williston. However, it does not appear that the decline in value of the lei had been interrupted at any point between the contract date of delivery and the time of actual delivery. Thus, under the formula espoused by the *Richard* court, the plaintiff would receive, if he proved his case on remand, maximum damages. *Oglesby v. Allen,* 408 F.2d 1154 (5th Cir. 1969), on the other hand, involved a delayed delivery of securities. There, however, the plaintiff herself requested the court's resort to the type of calculation suggested by Williston. It may safely be assumed, therefore, that in the *Oglesby* case the subject stock had likewise experienced a steady and uninterrupted decline from the scheduled date of delivery to the actual delivery date.

What is missing from the above authorities is perhaps supplied by decisions involving conversions of commodities having a fluctuating value, i. e., "a compromise attempt to value the chance that the plaintiff might at some time have profited by a rise in value." McCormick, Damages § 48, at 188 (1971). [McCormick]. Admittedly, the conversion cases are apposite here only by analogy—although at least the one court confronted with a situation square with our own apparently felt no discomfort in equating its defendant's "failure to act promptly to free plaintiff's stock for public sale," with a conversion. *Harrison v. The Lehigh Press, Inc.,* Slip.Op.No. 3044 (Ct. of Common Pleas, Phila. Co., Pa., March 16, 1976).

Notwithstanding *Harrison,* this Court must concede that the measure of damages for conversion of stock—i. e., the highest replacement value of the converted securities within a reasonable time from conversion (or, in some jurisdictions, from notice of the conversion), see 31 A.L.R.3d Conver-

sion of Stock—Damages (1970)—cannot be applied to cases such as our own without some modification. It may be noted that the "replacement" theory of damages is often enough, even in true conversion cases, McCormick at 188, a modest fiction, designed to effect a necessarily "rough justice." *Cf.* McCormick at 184–85; for such purpose, that license may, then, be extended to our own case.

This Court declines Charter's invitation to conclude that, under the law of Florida, damages must be confined to the price of Charter stock at the time of conversion, or rather, breach. To be sure, the Florida cases on point are far from models of clarity. Thus, in *Klein v. Newburger, Loeb & Co.,* 151 So.2d 879 (Fla.App.Ct.1963), a Florida District Court of Appeal ruled that, "in a case involving the conversion of corporate stock, damages are to be measured by the value of the stock within a reasonable time after the conversion", *id.* at 880, but nonetheless remanded—without relevant discussion—for judgment based upon the stock's value as of the date of conversion. That same court, six years later, nevertheless recognized a dichotomy between the "general rule [that] the measure of damages for the conversion of personal property is the value of the property at the time of conversion", and the measure of "damages for the conversion of corporate stock", i. e., " 'the value of the stock within a reasonable time after the conversion.' " *Grimes v. Holt,* 225 So.2d 566, 569 (Fla.App.Ct.1969). However obscure may be the Florida law on point, at least one other federal court applying that law has not been deflected from analyzing the stock conversion/damages issue before it in terms of "the highest value of the stock within [a] reasonable time" of more than six months from the date of conversion. *Berman v. Airlift International, Inc.,* 302 F.Supp. 1203, 1207 (N.D.Ga.1969).

This Court concludes that the analog of the "reasonable time for replacement" standard appropriate here is the reasonable time in which Madison could have disposed of its shares—without depressing the market—had it been able to do so from Decem-

ber 3, 1971. The only relevant evidence on this point is that supplied by defendant's expert witness. It was his opinion, unrefuted by plaintiff and now accepted by this Court, that, had Madison's stock been freed as of December 2, 1971, Madison could have disposed of all 64,500 shares within one month thereafter [Tr. at 853–54]. The highest price reached by Charter common stock between December 3, 1971, and January 3, 1972, was $34.625, i. e., the highest "bid" price reported on December 31, 1971 [PX–82].

From this figure, of course, should be deducted the amount which Madison could have realized from the sale of its Charter shares within a reasonable time after they were registered on August 31, 1972. Thus, the Court will not take into account Madison's delay in the sale of its shares for speculative purposes. To do so, this Court concludes, would be to charge defendant with an undertaking, in the event of its default, that is not reflected in the record, i. e., in effect, to underwrite Madison's sales. Again, the only relevant evidence on the question was supplied by defendant's expert. His opinion, again unrefuted by plaintiff, was that—given the trading volume in the stock during that period—Madison could have sold its 64,500 Charter shares within two months of their registration, at an average price per share of $27 [Tr. at 852–53]. That conclusion will be adopted by the Court.[3]

The damages are thus to be computed at the rate of $7.625 per share for 64,500 shares, or a total of $491,812.50, minus whatever dividends Madison received on its Charter stock between December 31, 1971, and May 8, 1973.

■ Under Florida law, "[w]here the judgment is for damages, interest may not be added to the amount of the judgment unless there can be a conclusive determination of an exact amount due and a date from which interest can be computed." Bryan & Sons Corp. v. Klefstad, 265 So.2d

382, 385 (Fla.App.Ct.1972) (emphasis in original). Thus, if "the demand, though unliquidated, is capable of ascertainment by mere computation or by reference to well-established standards of value," 9A Fla.Jur. Damages § 88, at 322, the Florida courts will allow an award of interest.

The present case, however, is not one in which "the damages could be readily liquidated and ascertained * * * by simple computation". Sullivan v. McMillan, 37 Fla. 134, 19 So. 340, 343 (1896). Indeed, the foregoing discussion of damages is enough to demonstrate that the amount recoverable by plaintiff has surely been beyond the parties' safe prediction or the Court's ready determination. Accordingly, there will be no allowance of interest here.

Madison shall have judgment on the amount indicated above.

Submit judgment order on notice.

SO ORDERED.

## SUPPLEMENTAL OPINION

CONNER, District Judge.

Presently at bar is a proposed Judgment submitted on behalf of plaintiff Madison Fund, Inc., and a counter proposed Judgment submitted on behalf of defendant The Charter Company, pursuant to an Opinion of this Court dated January 14, 1977. The parties' submissions in connection with their respective proposed Judgments—or rather, their points of difference—prompt the Court to add some comments with respect to the following passage from its January 14, 1977 Opinion:

"[Plaintiff's] damages are * * * to be computed at the rate of $7.625 per share for 64,500 shares, or a total of $491,812.50, minus whatever dividends Madison received on its Charter stock between December 31, 1971 and May 8, 1973."

As noted in the Opinion, the figure $7.625 represents the highest "bid" price reached

---

3. This Court concludes that the "average price" standard is appropriate in this context, essentially involving damages mitigation. The

"highest price" standard applied earlier, by contrast, is designed to allow plaintiff some recoupment of lost opportunity.

by Charter common stock during the thirty-day period in which plaintiff would have first been able to dispose of its entire holdings in Charter stock (*i. e.*, 64,500 shares) had the stock been registered in accordance with the parties' contract. As indicated in the margin of the Opinion, the Court settled upon a damages formula thus based on the highest price reached during that period "to allow plaintiff some recoupment of lost opportunity" to sell its shares at a higher price thereafter. For such purpose—that is, to calculate what is necessarily elusive—this Court indulged in what it unhappily acknowledged to be a "fiction," derived from analogy to the "highest replacement value" rule in conversion cases. As one commentator has observed, that rule

> "assumes that the plaintiff would have replaced himself at the peak price of [a] limited period. More in accordance with probabilities would be the taking of the *average* price for the period. * * *. Of course, the highest price for the limited period is really adopted as a compromise attempt to value the chance that the plaintiff might at some time have profited by a rise in value." McCormick, Damages ch. 6, at 188–89 (emphasis in original) (footnote omitted).

The fiction employed in this case resides, of course, in the seeming assumptions that plaintiff would have sold all of its Charter stock at the highest price during the thirty-day period, *i. e.*, on December 31, 1971, and, indeed, that plaintiff would have been able to do so without depressing the market (notwithstanding the Court's determination that such a volume of stock could be sold without depressing the market only if the sales were spread over the thirty-day period).

Plaintiff now asks the Court, in effect, to extend that fiction to the calculation of dividends to be deducted from the figure $491,812.50 (arrived at by multiplying 64,-500 shares by the highest price reached on December 31, 1971). Hence, plaintiff argues, dividends payable on December 31, 1971 to stockholders of record on December 20, 1971 should not be deducted because,

had plaintiff actually sold all of its stock on December 31, 1971, it would have received the dividend. However, at the risk of further seeming inconsistency, this Court declines to stretch the fiction to that extent—an extension unjustified by the aforementioned purpose of compensation for lost opportunity. Accordingly, the Court has chosen to sign the counter proposed Judgment (allowing the deduction only of dividends payable to stockholders of record on or after January 1, 1972), altering that Judgment only to the extent of including costs in the award to plaintiff.

SO ORDERED.