THERATX, INC., Plaintiff-Counterclaim Defendant-Appellee-Cross-Appellant,

v.

James DUNCAN, Timothy S. Smick, et al., Defendants-Counterclaim Plaintiffs-Appellants-Cross-Appellees.

No. 99-11451.

United States Court of Appeals,

Eleventh Circuit.

Dec. 8, 2000.

Appeals from the United States District Court for the Northern District of Georgia, (No. 95-03193-CV-RWS-1), Richard W. Story, Judge..

Before BIRCH, BARKETT and ALARCON[*], Circuit Judges.

BIRCH, Circuit Judge:

AMENDED OPINION

Appellee-cross-appellant TheraTx, Inc. appeals the district court's grant of summary judgment to the Duncan Group on its breach of contract claim. Appellants-cross-appellees the Duncan Group[1] appeal the district judge's calculation of their damage award. James and Jean Duncan and Timothy and Bobbi Smick, members of the Duncan Group, also appeal the district court's determination that they lacked standing to recover damages for shares of TheraTx stock that were transferred to their respective charitable trusts and shares that they received as a gift from James F. McCormick.

I. BACKGROUND

A.   *The TheraTx Stock*

In 1994, TheraTx, a Delaware health care corporation with its principal place of business in Georgia, began negotiations with the management of PersonaCare, Inc., a privately held corporation that owned nursing facilities, and PersonaCare's majority shareholder, Warburg-Pincus. The remaining shares in PersonaCare were owned by members of the Duncan Group and other individuals. Warburg-Pincus did not

---

[*]Honorable Arthur L. Alarcon, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

[1]The Duncan Group consists of the following former PersonaCare shareholders and trusts created by them:  James W. Duncan, Jr.;  Jean M. Duncan, as Co-Trustee of the Emanuel Foundation and the Kyrios Foundation;  Timothy S. Smick;  Bobbi G. Smick, as Co-Trustee of the Caleb Fund and the Joshua Fund;  James F. McCormick;  Arthur W. Trump, Jr., Individually, and as Trustee of the David S. Hungerford, Grantor Retained Annuity Trust # 1, and as Trustee of the David S. Hungerford, Grantor Retained Annuity Trust # 2;  Dr. David S. Hungerford;  and Travers C. Nelson.

believe that the management of PersonaCare was capable of building the company into a serious competitor in the health care business, and sought out a merger partner. Warburg-Pincus was referred to TheraTx. *See* R7-59, Ex. E at 11. TheraTx was attractive to Warburg-Pincus because TheraTx's management was "looking to more rapidly pursue a consolidation in the industry, ... appeared to have a better understanding of where the industry was going, and ... were just more likely to be able to build a growing company." *Id.* The PersonaCare shareholders, including the Duncan Group, expected TheraTx to grow.

In May 1994, TheraTx and PersonaCare entered into a merger agreement (the "Agreement"). *See* R7-59, Ex. A. Under the Agreement, PersonaCare shareholders exchanged their stock for restricted, unregistered stock in TheraTx. Because the parties anticipated that TheraTx would undertake a public offering of its shares of common stock as soon as practicable following the merger, the Agreement included a provision that, in the event that TheraTx went public, it would file a Shelf Registration effective for two years.[2] On 24 June 1994, TheraTx conducted a successful IPO at $12 per share. On 7 December 1994, TheraTx's counsel notified the former PersonaCare shareholders that they were free to trade their TheraTx stock under the Shelf Registration beginning on 12 December 1994. The letter advised the former PersonaCare shareholders that any transferee of their shares who wished to sell would have to be listed in the Shelf Registration. The letter also advised that "it may become necessary *to suspend the use of the Shelf Registration* pending [any legally required] amendment." Def. Trial Ex. 6 at 2. On 12 December 1994, TheraTx effected a Shelf Registration covering the TheraTx common stock distributed to all former PersonaCare shareholders under the Agreement. That day the shares traded at $19.50. During the next

---

[2]Section 6.6 reads as follows:

> *Warburg Shelf and Demand Registration.* (a) Promptly (and in any event within 10 days) following the expiration of any lock-up agreement with the underwriters in connection with the Initial Public Offering ... TheraTx shall effect a shelf registration (the "*Shelf Registration* ") of all shares of TheraTx Common Stock ... issued to the PersonaCare Stockholders in connection with the Merger.
>
> ...
>
> TheraTx shall cause the Shelf Registration to remain in effect until two years following the Effective Date.
>
> The PersonaCare Stockholders' rights under this Section 6.6 shall not be assignable and such rights hereunder shall terminate at such time as such stockholder is entitled to sell all of the Shares held by such stockholder without registration under the Securities Act.

R7-59, Ex. A at 47.

month, the shares traded between $16.50 and $20.126 per share.

In November 1994, TheraTx began negotiations to purchase the assets of eight healthcare companies managed by Southern Management Services, Inc. ("SMS"). TheraTx and SMS entered into an agreement for the purchase of the SMS assets on 13 January 1995. TheraTx discussed the effect of the SMS purchase on the Shelf Registration with officials at the SEC and concluded that it was necessary to suspend trading under the Shelf Registration in order to amend it to include information regarding the SMS transaction. On 12 January 1995, TheraTx advised the former PersonaCare shareholders by letter that their ability to trade under the Shelf Registration would be suspended on 13 January 1995.[3] On 13 January 1995, TheraTx publicly announced the SMS transaction and suspended trading of its shares under the Shelf Registration, and TheraTx stock closed at $18.750 per share.

On 29 June 1995, TheraTx notified the former PersonaCare shareholders that the trading suspension would be lifted on June 30.[4] During the suspension period, the value of TheraTx stock rose to a high of $23.125 on February 3, and closed at $13.375 on June 30. TheraTx was bought by Vencor, Inc. on a tender offer of $17.10 per share in March 1997.

---

[3]The letter reads:

> As you will recall, by letter dated December 7, 1994, we notified you of the effective date of the shelf registration statement registering the shares issued to you in connection with the acquisition of PersonaCare by TheraTx. At that time, you were informed that TheraTx could find it necessary to suspend the use of the registration statement from time to time due to events occurring at TheraTx.
>
> The purpose of this letter is to notify you that *COMMENCING FRIDAY, JANUARY 13, 1995,* your ability to use the shelf registration statement will be *SUSPENDED* until further notice. We will notify you when you may once again commence selling shares under the shelf registration.
>
> The letter was signed by TheraTx Vice President and General Counsel Jonathan H.

Glenn. R7-59, Ex. L-1.

[4]The letter, from Laura M. Brower of Brobeck, Phleger & Harrison, reads in part:

> As you were notified in a letter from Jonathan H. Glenn, on January 12, 1995, the shelf registration statement registering the shares issued to you in connection with the acquisition of PersonaCare by TheraTx was temporarily suspended. The purpose of this letter is to inform you that the shelf registration will once again become effective commencing Friday, June 30, 1995 at 12:00 p.m., eastern time. Accordingly, beginning 12:00 p.m., eastern time, June 30th you will be permitted to once again sell shares pursuant to the shelf registration under the circumstances and in the manner described in the letter of instructions sent to you on December 7, 1994 (copy attached).

R7-59, Ex. L-2.

B.      *The Duncan Shares*

During the summer and fall of 1994, Timothy Smick, former PersonaCare Chairman and Chief Executive Officer, and James Duncan, former PersonaCare President, met with stock brokers, money managers and a tax attorney regarding the transfer of their TheraTx stock holdings to charitable remainder trusts in order to take advantage of the associated tax benefits.

Smick established two trusts on 13 December 1994, and Duncan established two trusts on 22 December 1994. On 16 December 1994, Smick gifted at total of 150,000 shares of TheraTx stock to his two trusts. Smick also endorsed his certificate and delivered it to his stockbroker and the trusts' money manager, Alex. Brown & Sons, Inc. ("Alex.Brown"). On 27 December 1994, Duncan instructed Alex. Brown to transfer his TheraTx stock into two trust accounts on the date that the stock hit certain target prices, and, about the same time, delivered the stock certificate and a written assignment. The stock certificates of Duncan and Smick stated that their shares were "transferable only on the share register of said corporation, in person or by duly authorized attorney." R13-98-Exs. R, S. On 12 January 1995, Alex. Brown notified TheraTx's stock transfer agent of the wishes of Duncan and Smick to transfer their stocks to their respective trusts. In each letter, Duncan and Smick requested that the shares be transferred without restrictions. Alex. Brown transferred the shares to the trusts and confirmed the transfers to Duncan and Smick.

TheraTx's counsel notified TheraTx's stock transfer agent that the transfers of the "request effective as of January 12, 1995 ... on behalf of Mr. James W. Duncan, Jr." and of the "request effective as of January 12, 1995 ... on behalf of Mr. Timothy S. Smick" were approved on 13 April 1995 and 23 March 1995, respectively. R12-96, Exs. F and G; R13-98, Ex. N at 39-41. TheraTx's stock transfer records show that the transfer from Duncan to his trusts occurred on 18 April 1995, and from Smick to his trusts occurred on 3 April 1995. Smick's federal income tax return reflected a December 1994 transfer of stock to the trusts. Duncan's federal income tax return reflected a January 1995 transfer of stock to the trusts.

The Duncans and Smicks filed a complaint for breach of contract as trustees, and sought damages on behalf of their respective trusts. The district judge dismissed these claims, holding that the trusts lacked standing because the registration rights under section 6.6 of the Agreement were not assignable. The Duncan Group moved for reconsideration, arguing that Duncan and Smick should be permitted to "assert their breach of contract claims with respect to those shares of TheraTx stock transferred in April 1995 to their respective charitable remainder trusts." R12-96-2. The district judge, however, found that no determination of when Mssrs. Duncan and Smick transferred sizable portions of their TheraTx holdings to charitable trusts was

necessary, because the undisputed evidence showed that, as to the shares transferred to the trusts, no damages were suffered by Duncan and Smick as a result of the breach, regardless of the dates of transfer. Although the Duncan Group, on reconsideration, requested that the district court determine the date of transfer, the district court denied the request, noting that "there are no perils of uncertainty with respect to the charitable trust shares that should be laid at TheraTx's door and, instead, any belief that recovery may be had for these shares should be laid to rest." R15-113-3-4.

C.    *The McCormick Shares*

James McCormick received 150,118 shares of TheraTx stock in the merger. During the fall of 1994, he transferred 18,700 shares of TheraTx stock to Duncan and transferred 18,700 shares of TheraTx stock to Smick.[5] The district judge also found that Duncan and Smick had no standing to sue or to recover damages with respect to these shares because they "received the McCormick shares by transfer after the merger agreement." R15-114-2-3.

D.    *Other Duncan Group Members*

None of the other Duncan Group Members disposed of their shares until after the suspension was lifted. After the suspension was lifted, those shares sold in the range of $13.311 to $18.750 per share until the shares were proffered to Vencor at $17.10 per share.

E.    *The Lawsuit*

TheraTx filed an action for declaratory judgment, seeking clarification of the rights, status and legal relations of the parties under the Agreement regarding the suspension of the Shelf Registration. The Duncan Group counterclaimed that TheraTx had violated section 10(b) of the 1934 Securities Act, breached the Agreement, committed common-law fraud, and made a negligent misrepresentation.[6] On the breach of contract claim, the district court found that the Agreement's terms requiring the Shelf Registration to remain in effect for two years was unambiguous and that TheraTx breached the contract when it suspended trading under the Shelf Registration.

## II. DISCUSSION

[5]We shall refer to the TheraTx stock transferred by McCormick to Duncan and Smick, collectively as the McCormick Shares.

[6]The Duncan Group alleged in district court that TheraTx fraudulently or negligently failed to disclose its plans for large acquisitions that could result in a suspension of trading under the Shelf Registration. The district court granted summary judgment for TheraTx on these claims, and the Duncan Group has not appealed this decision. *See* R8-79-16-21.

On appeal, the Duncan Group argues that the district court erred by concluding that it could not recover damages for the TheraTx stock transferred to the charitable remainder trusts. They assert that if the transfers of TheraTx stock to the trusts occurred after the breach, then Duncan and Smick have standing to recover damages based upon those shares. They also argue that they have standing to recover damages based upon the shares they received from McCormick, because TheraTx acknowledged that transfer on its register. The Duncan Group further contends that the district court erred in its calculation of damages by deducting from the award the actual amount for which they sold their TheraTx stock once trading under the Shelf Registration resumed. TheraTx argues that the district court incorrectly determined that it breached its obligation under Section 6.6 of the Merger Agreement by suspending trading as required by the SEC.

We review de novo the district court's order granting summary judgment. *See Williams v. Vitro Services Corp.,* 144 F.3d 1438, 1441 (11th Cir.1998). A motion for summary judgement should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In making this assessment, we must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997), and "resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. v. Sun Life Ins. Co.,* 894 F.2d 1555, 1558 (11th Cir.1990).

The parties agreed that "[t]he laws of the State of Delaware ... govern the validity of [the Agreement], the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties." R13-98-Ex. A at 58. Accordingly, we apply Delaware contract law.

A.    *Breach*

In determining that TheraTx breached its contractual duty under section 6.6 of the Agreement, the district judge reasoned that the "core purpose, indeed the only purpose, of the Shelf Registration Statement was to give PersonaCare shareholders the right to trade at any time after TheraTx publicly offered its stock" and that, by promising to maintain the effectiveness of the Shelf Registration, TheraTx had promised "that

action w[ould] be taken to ensure that the [Shelf Registration] continue[d] to perform its core purpose." R8-79-14.

On appeal, TheraTx argues that its obligation "to cause the Shelf Registration to remain in effect for two years" under section 6.6 of the Agreement must be interpreted by giving the word "effect" its meaning as a term of art in the context of securities regulations governing the Shelf Registration. According to this argument, the Shelf Registration remained "in effect" following TheraTx's merger with SMS despite the suspension of trading that prevented the Duncan Group from selling its shares of TheraTx stock. TheraTx contends that the Shelf Registration was still "in effect" when it suspended trading under the Shelf Registration in order to amend its prospectus, and, given its stated strategy of growth via acquisitions, it was unreasonable for the PersonaCare shareholders to expect that TheraTx would not complete any acquisitions which might require such a suspension of trading under the Shelf Registration.

Under Delaware law, courts seeking to resolve contract disputes look first to the terms of the contract itself. *See Continental Insurance Company v. Rutledge & Company, Inc.,* 750 A.2d 1219, 1228 (Del.Ch.2000). In doing so, we "give the terms of contracts their plain meaning" and should "not look behind the terms and provisions of a clear and unambigous contract." *Id.* A contract is clear and unambiguous when its terms "establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997). Only when a contract provision is "fairly susceptible of different interpretations" should a court "look beyond the language of the contract to ascertain the parties' intentions." *Id.*

We agree with the district judge that section 6.6 of the Agreement is clear and unambiguous, and should, therefore, be interpreted according to the plain meaning of its terms. We also conclude that the rules governing the effective date of a registration statement and amendments thereto, codified at 15 U.S.C. § 77g, do not utilize the word "effective" in a unique or distinctive manner, thereby creating a special meaning or making the word a term of art within the arena of securities law.

While we agree with TheraTx that it seems implausible that the "expert securities lawyers" representing both parties to the Agreement did not anticipate the possibility that TheraTx, a company with a stated strategy of growth by acquisition, would be required by securities regulations to suspend trading under the Shelf Registration as a result of some future merger or acquisition, *see* Amended Brief of Appellee-

Cross-Appellant at 50, we conclude that TheraTx was in the best position to fully appreciate the parameters of its growth strategy and anticipate the impact this strategy would have upon its commitments under the Agreement. Therefore, it was incumbent upon TheraTx to appropriately tailor its contractual obligation under section 6.6 to account for the possibility that it might engage in a merger which would necessitate the suspension of trading under the Shelf Registration. The PersonaCare shareholders were entitled to rely on the contract terms as written. Accordingly, we conclude that TheraTx breached its contractual obligation under section 6.6 of the Agreement when it suspended trading under the Shelf Registration following its merger with SMS.

B.    *Standing*

1.    Trust Shares

The district judge determined that the trustees of the charitable remainder trusts created by Duncan and Smick did not have standing to collect damages associated with TheraTx's breach of the Agreement because the rights provided to the PersonaCare shareholders by section 6.6 of the Agreement were not assignable. The district judge did not determine the effective date of Duncan and Smick's transfer of their TheraTx stock to the respective charitable trusts, because he concluded that Duncan and Smick had not suffered actual monetary damages with regard to the TheraTx stock transferred to the trusts as a result of the breach. The district judge reasoned that "[t]he only monetary benefit that Messrs. Duncan and Smick received from donating TheraTx shares to the charitable trusts was their ability to claim charitable tax deductions based on the value of the stock at the time of the transfer." R14-103-3. He concluded that, because the suspension of trading had not delayed or affected Duncan and Smick's ability to transfer the stock to the trusts, TheraTx's breach of contract had not affected the value of the charitable donations made by Duncan and Smick and the associated tax deductions.

On appeal, the Duncan Group argues that if Duncan and Smick continued to hold all of their TheraTx stock at the time of TheraTx's breach, and the transfer of their TheraTx stock to charitable remainder trusts did not become effective until after the breach, then they have standing to sue for the damage caused by to them by the breach regardless of their subsequent disposition of the stock. The Duncan Group further argues that Duncan and Smick were damaged by TheraTx's breach because the suspension of trading caused a reduction in the trust income that they were entitled to receive annually during their lifetimes by interfering with the trusts' ability to sell the shares and reinvest the proceeds elsewhere. We find, however, that ownership of the shares was transferred prior to the date of the breach, and as a result, the trusts have no

standing to sue for damages.

Delaware law governs our analysis. At the time of the breach, 13 January 1995, § 8-313 of Delaware's Uniform Commercial Code ("U.C.C.") set forth the requirements for when transfer of a security to a purchaser occurs. *See* DEL.CODE. ANN. tit. 6, § 8-313 (1995). A recipient by gift is a purchaser under the Delaware U.C.C. *See* DEL.CODE. ANN. tit. 6, § 1-201(32) (1995). Section 8-313 lists several ways that transfer may occur, depending on whether the security being transferred is certificated or uncertificated. The securities held by Duncan and Smick were certificated securities because they were represented by instruments that specified Duncan and Smick as the owners and provided that transfer could be registered on the books of the corporation. *See* R13-98-Exs. R,S: *see also* DEL.CODE. ANN. tit. 6, § 8-102(1)(a) (1995) (defining a certificated security).

According to the U.C.C. provisions then in force, certificated securities were deemed transferred to a purchaser only:

(a) At the time he or a person designated by him acquires possession of a certificated security; ...

(c) At the time his financial intermediary acquires possession of a certificated security specially endorsed to or issued in the name of the purchaser;

(d) At the time a financial intermediary, not a clearing corporation, sends him confirmation of the purchase and also by book entry or otherwise identifies as belonging to the purchaser

(i) a specific certificated security in the financial intermediary's possession;

(ii) a quantity of securities that constitute or are part of a fungible bulk of certificated securities in the financial intermediary's possession ...

DEL.CODE. ANN. tit. 6, § 8-313(1) (1995).

Application of this statute is complicated by the fact that both Duncan and Smick were trustees of their respective trusts. Certain facts, however, are clear. Both provided their stock certificates to Alex. Brown with instructions to transfer ownership to their respective trusts. Alex. Brown issued statements indicating that it had transferred TheraTx stock from the individual donees to the trust accounts, in December 1994 for Smick and January 1995 for Duncan.

Alex. Brown was the stockbroker for the trusts. We find that when Duncan and Smick endorsed their stock certificates and provided them to Alex. Brown with instructions to transfer the stock to the trusts, Alex. Brown acquired possession of the certificated security on behalf of the trusts, thereby satisfying § 8-313(1)(a). It is possible that, because Alex. Brown qualifies as a "financial intermediary" as defined in § 8-313(4), that other subsections of § 8-313 were also satisfied. We express no opinion as to these other possible methods

of transfer as the requirements of § 8-313(1)(a) were satisfied. We do note, however, that while the transfers of the shares were not reflected on TheraTx's books until after the breach, § 8-313 imposes no such requirement on the validity of a transfer. Indeed, § 202 of Delaware's corporations code, which controls over sections of the U.C.C., provides that restrictions on the transfers of security "may be enforced against the holder of the restricted security" or her successor, but do not provide for enforcement against the corporation. DEL.CODE. ANN. tit. 8, § 202(a) (1995). Duncan and Smick intended to transfer their shares to charitable remainder trusts, and the records of Alex. Brown reflect that those intentions were carried out. To allow Duncan and Smick to enforce trading restrictions against themselves in order to collect damages thwarts both their original intent to transfer their shares prior to the date of the breach and the parties' contractual agreement that contract rights, including remedies for breach, were not to be transferrable.

2.      McCormick Shares

The district judge also determined that Smick and Duncan did not have standing to recover for breach of the Agreement with respect to the McCormick shares because the rights granted to PersonaCare shareholders in section 6.6 of the Merger Agreement were not assignable. On appeal, the Duncan Group argues that, because TheraTx recorded the transfer from McCormick to Duncan and Smick on its stock register in October 1994 and subsequently reflected the transfer of ownership from McCormick to Duncan and Smick in the Amended Shelf Registration under which trading resumed on 30 June 1995, TheraTx acknowledged the rights of Duncan and Smick to have the McCormick Shares included in the Shelf Registration and should be estopped from asserting that Duncan and Smick did not have the right granted by section 6.6 of the Agreement to have those shares registered. In making this argument, the Duncan Group attributes TheraTx's failure to include the McCormick shares in the names of Duncan and Smick, respectively, as an oversight and mistake.

TheraTx counters that it was not obligated to register any shares of TheraTx stock received by PersonaCare shareholders after the Agreement was executed. Accordingly, TheraTx was not obligated to include the McCormick shares acquired by Duncan and Smick in the Shelf Registration. Further, TheraTx asserts that the crediting of the McCormick shares to Duncan and Smick in the Amended Shelf Registration after the January 1995 breach does not estop it from denying that Duncan and Smick have contractual rights with regard to the McCormick Shares.

We have determined that the rights of the PersonaCare stockholders were not assignable under the clear terms of Section 6.6. Therefore, when McCormick gifted a portion of his TheraTx stock to Duncan and

Smick, McCormick's contractual right for those shares to be included in the Shelf Registration was not transferred to Duncan and Smick. Further, Duncan and Smick have failed to demonstrate any conduct on the part of TheraTx which suggests that Duncan, Smick, or any other person who received restricted shares of TheraTx stock after the execution of the Agreement would be entitled to sell that stock under the Shelf Registration under an estoppel theory. The 7 December 1994 letter from TheraTx's attorney to PersonaCare stockholders explained that if the PersonaCare stockholders chose to gift their TheraTx stock to another individual or entity, the recipient would receive restricted stock and the recipient stockholder would have to be listed in the Shelf Registration Prospectus in order to be able to sell the gifted stock. The letter further requested that the PersonaCare stockholders provide TheraTx a list of any potential gift recipients. The letter, however, did not undertake any new obligation to include such gift recipients in the Shelf Registration. Indeed, it specifically discussed the possibility that trading under the Shelf Registration would be suspended. Therefore, the Amended Shelf Registration's reflection of the gift could not have suggested to Duncan and Smick that they were entitled to trade the McCormick shares under the initial Shelf Registration at the time the breach occurred. *See Wilson v. American Insurance Co.,* 209 A.2d 902, 903-904 (Del.1965) (requiring lack of knowledge of truth and detrimental reliance to establish estoppel). Therefore, we conclude that the district court correctly determined that Duncan and Smick were not entitled to recover damages for the breach of contract with regard to the McCormick shares.

C.      *Calculation of Damages*

The district judge purported to calculate the damages of the Duncan Group using a "modified conversion" analysis. Accordingly, he concluded that the Duncan Group was entitled to recover the difference between the highest intermediate value that the TheraTx stock reached during a reasonable time after trading was suspended and the actual price they were ultimately paid for their stock. This reasonable time period was the ten days the district judge calculated that it would have taken the Duncan Group to dispose of their TheraTx stock without adversely affecting the stock price, according to historical trading volumes. He determined that the highest value reached by the TheraTx stock during this ten day period was $19.75. The district judge then subtracted the actual price at which the PersonaCare stockholders sold their TheraTx stock. He reasoned that it was appropriate to subtract the actual price the PersonaCare shareholders received for their TheraTx stock, rather than the average stock price during a reasonable period of time after the suspension of trading under the Shelf Registration was lifted, because the PersonaCare shareholders ultimately sold their TheraTx stock for a higher price than that at which they could have sold it during a

reasonable period following the suspension of trading, and they were " 'not entitled to be placed, because of [the] breach, in a position better than that which [they] would have occupied had the contract been performed.' " R 16-130 at 5 (quoting *Madison Fund, Inc. v. Charter Co.,* 427 F.Supp. 597, 608 (S.D.N.Y.1977) (applying Florida law)).

The Duncan Group argues that the district judge's reasoning was incorrect, because, although they might have sold during the period that trading was suspended under the Shelf Registration, they nevertheless took a risk and made a new investment decision to hold their stock once the trading suspension was lifted. TheraTx argues that, although Delaware courts have not addressed specifically the proper method for calculating damages in a case involving breach of a contract by suspension of trading under a Shelf Registration, the district judge's analysis was consistent with general principles of Delaware contract law. *See American Gen'l Corp. v. Continental Airlines Corp.,* 622 A.2d 1, 8 (Del.Ch.1992) (finding the measure of damages is usually that which is necessary to put the claimant in as good a position as he would have occupied if the contract had been performed); *E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 445 (Del.1996) (stating contract damages are awarded to compensate the injured party and not to punish the breaching party).

Our review of Delaware law reveals no binding authority establishing a specific method for measuring contract damages in circumstances similar to those presented in this case. Thus, while we do not suggest that the district judge's method of computing damages was inconsistent with Delaware law, we conclude that this case presents an unsettled question of Delaware law. Therefore, because the method of calculation of damages is dispositive of the claims in this case, and because it raises an important issue of state law, we certify the following question to the Supreme Court of Delaware, pursuant to Del. S.Ct. Rule 41:[7]

> WHAT IS THE PROPER MEASURE OF DAMAGES WHEN A DEFENDANT'S CONTRACTUAL OBLIGATION TO CAUSE A SHELF REGISTRATION, UNDER WHICH PLAINTIFF IS ENTITLED TO TRADE A RESTRICTED STOCK, TO REMAIN IN EFFECT FOR A SPECIFIED PERIOD OF TIME IS BREACHED BY DEFENDANT'S TEMPORARY SUSPENSION OF PLAINTIFFS' ABILITY TO TRADE THE RESTRICTED STOCK?

The phrasing of this certified question is not intended to limit the Delaware Supreme Court's consideration of the various issues posed by this case. The entire record and the briefs of the parties shall be transmitted

---

[7]Delaware Supreme Court Rule 41 provides that certification shall be provided to the Delaware Supreme Court in a specific form. That form appears as Appendix A to this opinion.

to the Supreme Court of Delaware to assist in its determination, should it accept our certification.

### III. CONCLUSION

Because we find that TheraTx breached its obligations under Section 6.6 of the Agreement, and that Duncan and Smick have no standing to sue for damages for shares received as gift from McCormick or transferred by them to charitable remainder trusts, we AFFIRM in part and CERTIFY the question of the appropriate method of calculating damages in this case to the Supreme Court of Delaware.

### APPENDIX A

TheraTx, Inc., Plaintiff-Counterclaim defendant-Appellee-Cross-appellant,

v.

James Duncan, Timothy S. Smick, et al., Defendants-Counterclaim plaintiffs-Appellants-Cross-appellee.

No. 99-11451.

United States Court of Appeals,
Eleventh Circuit.

### CERTIFICATE OF QUESTIONS OF LAW

This *8th* day of December, 2000, the Court having found that:

(1) The nature and state of the proceedings are:

TheraTx, Inc. was sued in district court for breach of contract by various shareholders who acquired restricted, unregistered shares of TheraTx stock in a merger. The district court dismissed some plaintiffs' claims for lack of standing, granted summary judgment to the remaining plaintiffs on the breach of contract claim and awarded them damages. We affirm the dismissal for lack of standing and summary judgment for the remaining plaintiffs on the breach of contract claim. We certify to the Delaware Supreme Court the question of what method of calculation of damages is appropriate.

(2) The following facts are undisputed:

TheraTx and PersonaCare, Inc. merged in 1994. Pursuant to the terms of the merger agreement, PersonaCare shareholders exchanged their shares for restricted, unregistered shares in TheraTx. The merger agreement required that, if TheraTx went public, it would file a Shelf Registration and "cause the Shelf Registration to remain in effect until two years after the effective date." R7-59, Ex. A, at 47. TheraTx held an initial public offering on June 24, 1994. Trading under the Shelf Registration began December 12, 1994.

TheraTx purchased Southern Management Services, Inc. on January 13, 1995, and, after discussion with Securities and Exchange Commission officials, suspended trading under the Shelf Registration on January 13, 1995. The suspension was lifted on June 30. During the suspension period, the value of TheraTx stock rose to a high of $23.125 on February 3, and closed at $13.375 on June 30. TheraTx was bought by Vencor, Inc. on a tender offer of $17.10 per share in March 1997.

(3) The questions of law set forth below should be certified to the Supreme Court of the State of Delaware for the following reasons:

The certified question presents an unsettled question of Delaware law which this court will be required to decide in the first instance if certification is not granted.

(4) Expedited review is not necessary in this case.

(5) If certification is accepted, it is recommended that James Duncan, Timothy S. Smick, et al. be appellants for purposes of the caption on any filings in the Supreme Court of Delaware and that TheraTx, Inc. be appellee for purposes of the caption on any filing in the Supreme Court of Delaware with respect to the questions certified.

NOW, THEREFORE, IT IS ORDERED that the following question of law is certified to the Supreme Court of the State of Delaware for disposition in accordance with Rule 41 of the Supreme Court:

WHAT IS THE PROPER MEASURE OF DAMAGES WHEN A DEFENDANT'S CONTRACTUAL OBLIGATION TO CAUSE A SHELF REGISTRATION, UNDER WHICH PLAINTIFF IS ENTITLED TO TRADE A RESTRICTED STOCK, TO REMAIN IN EFFECT FOR A SPECIFIED PERIOD OF TIME IS BREACHED BY DEFENDANT'S TEMPORARY SUSPENSION OF PLAINTIFFS' ABILITY TO TRADE THE RESTRICTED STOCK?

Dated: *December 8, 2000*

BIRCH, BARKETT, and ALARCON, Circuit Judges

Counsel for the parties:

Counsel for James W. Duncan, Jean M. Duncan, et al.

Robert Rothman Richard Mitchell Arnall, Golden & Gregory, LLP 1201 West Peachtree Street, Suite 2800 Atlanta, GA 30309 (404) 873-8500

Counsel for Theratx, Inc.

R. Laurence Macon Rebecca Simmons Jo Beth Eubanks Akin, Gump, Strauss, Hauer & Feld, L.L.P. 300 Convent, Suite 1500 San Antonio, Texas 78205 (210) 281-7000